18346 Euro Benitez Marquez v. Barr, 192491 Paulino Rodriguez v. Barr, Ms. Padmanabhan. Good morning, Your Honor. It's Padmanabhan. Padmanabhan, I'm sorry. No problem at all. May I begin? Yes. Thank you. May it please the court, and I'm requesting one minute for rebuttal. Mr. Benitez asks the court to vacate the removal order in this case, which relies on a 2018 Attorney General decision, matter of Chapter 2. Chapter 2 conflicts with two federal regulations, which confer broad authority on immigration judges and the board to take any action that is appropriate and necessary for the disposition of cases. The only way for this court to uphold Chapter 2 is if it agrees with the Attorney General that there are no circumstances in which administrative closure is appropriate and necessary for resolving cases. Can I interrupt for just a second? I just wanted to – your time is limited, and I do hope you'll get to this question of the notice and comment rulemaking that resulted in a rule in mid-January, because while the other issues in this case are very interesting, important, and so on and so forth, they've already been addressed by nine, as I count them, nine Court of Appeals judges, whereas nobody, including the parties, addressed the effect of this rule. So you can do it any way the presider wants you to do it or you want to do it, but please don't end without one of the two of you telling us what we should do about that. I'm happy to begin with the new rule, Your Honor. That rule only applies prospectively to cases initiated or re-calendared after the effective date of the rule, which was January 15, 2021. So the new rule has no effect on either Mr. Benitez's or Mr. Paulino's cases, which were already ongoing at the time that the rule went into effect. Is that kind of the same as this notion of it being nunc protunque, which is a way of putting some Latin words on a simple notion? I don't believe that the new rule is nunc protunque in the sense that it would apply retroactively to Mr. Benitez's case, because the final rule makes clear in its preamble that it only applies to new cases before the agency. In other words, the regulations that existed at the time that we briefed them, at the time Castro-Chum was decided, remain in effect for Mr. Benitez. And if you were to remand this case, the old version of the regulations would continue to govern in this case. So no matter what happens to that, even if there was a new rule that erased this January 15th rule, it would have no effect on this argument. That's exactly right, Your Honor, because the question that remains is whether Castro-Chum was correctly decided. And as Your Honor said, two out of three courts of appeals held that Castro-Chum conflicted with the plain text of the regulation. All right, so can I ask you about that? Sorry, go ahead. No, go. Okay, so if I ask you about that text, so the regulation says appropriate and necessary, but it also says subject to the applicable governing standards. And then subsection D of the regulation, 1003.10D and 1003.1D1, say and make clear that the applicable governing standards include decisions of the attorney general. So doesn't the regulation say you can do what's appropriate and necessary as long as it's consistent with decisions of the attorney general? How would it allow you to, an IJ or the BIA, to take an action contrary to a decision of the attorney general? Well, you're right, Your Honor. IJs and the BIA currently, because of Castro-Chum, cannot administratively close cases under these two regulations. So the question here is whether Castro-Chum correctly interpreted the two regulations or whether he violated the plain text. No, no, no, but what I'm saying is because the regulation says that IJs and the BIA can do anything that's appropriate and necessary subject to, among other things, decisions of the attorney general, if the attorney general makes a decision that says administrative closure is inappropriate, then the regulation says you can do what's appropriate and necessary as long as it's not administrative closure because the decision of the attorney general has said that you can't do administrative closure. The whole regulation is qualified by subject to the applicable standards, which include decisions of the attorney general. You don't deny the attorney general has general authority to make decisions that govern IJs and the BIA, do you? I see you. I understand your question, Your Honor. I'm sorry. No, you're right that if an attorney general had said, look, I get adjudicators who have the power to administratively close cases. I'm just telling you it's never appropriate and necessary to administratively close cases. He might have been able to do that so long as his analysis was reasonable. That's, of course, not what this attorney general did, because this attorney general said that these regulations never confer the power to administratively close cases. And that's contrary to the plain text of the regulation, which confers on one. So you would deny that he did both things? I mean, as I read it, it seems like he said, because he also considered whether he should delegate the authority to administratively close cases. And he says, I'm not going to do that because I don't think it's a good idea. So he thinks it's not a good idea and then also thinks that the regulations independently don't confer the power. So so didn't the attorney general make both determinations? He says administrative closure is not a power that should be available to IJs and the BIA. And then he addresses the arguments about whether the regulations somehow vest them with that authority. And he says, I don't think that they do. Well, he definitely makes that latter point. And we think that latter point is wrong. It's contrary to the plain text of the regulations. But assuming he made that former point, which I'm not sure that he did. But assuming he said, look, I don't think administrative closure is a good idea, even if the regulations conferred that power. He would still have to be acting in a way that's reasonable and not arbitrary. And I think for that to happen, the attorney general should have done several things that Castro does not do. He would have had to have grappled with the four decades of agency policy saying that administrative closure is a good idea. And he'd have to have at least considered the reliance. But doesn't he do that? Doesn't he doesn't he have a whole discussion about how this power of administrative closure has been used to prevent cases from being resolved? And all of these cases have been put on ice and are not getting resolved. And I think that that is a bad that is a bad way to administer the system. It seems like he I mean, maybe you don't agree with his analysis, but it seems like he thought about that. He considered the relevant the relevant factors. Well, I think because he reached that latter conclusion that we were talking about earlier, that the regulations do not confer the power in the first place. He wasn't in a position to really think about whether the power should be used in one way or another, because he was started with the premise that the power was never conferred. And if you disagree with that premise, then I think you should overturn Castro, too. But even as to this point about whether he considered all of the policy considerations, he absolutely did not consider cases like Mr. Benitez's or Mr. Paulino's, which are a legion before the agency, where an individual in removal proceedings is pursuing collateral relief from removal before USCIS. And those are the types of cases in which the agency has historically found that administrative closure is particularly useful. Doesn't the attorney general in Castro, too, doesn't he say that to the extent that that delays of disorder necessary continuances are available? Well, I think that that is an indication of the deficiency in the attorney general's analysis. Because continuances are often not adequate. The agency has defined continuances as adjournments for short, brief periods, you know, for a few weeks. But they could be renewed, right? You're making a policy argument. Excuse me, this is Judge Walker. You're making a policy argument rather than looking at his analysis of the regulations. I think he referred to the continuances and adjournments as as indicators that when the regs were written, there was a specific attention paid to this to this problem. And those were the those those were the remedies that were offered continuances and adjournments. There was nothing explicitly said about administrative closures. And and so he's making the point that because they did address it specifically in address the problem specifically. And there were these two remedies that work were authorized specifically in the statutes. The fact that there was silence elsewhere on administrative closures indicates that that administrative closures were not appropriate. As a starting point. When I think that premise is wrong, your honor, because just going back to the regulatory text of these two regulations, they say any action that is appropriate and necessary for the disposition of the case. Now, yes, they don't explicitly identify administrative closure. Just raise a question. Any what what cases are they talking about? The only case before the IJ is the deportation case. And those are those are the such cases. Right. So regulations that are appropriate and necessary for the disposition of such cases, at least that's ambiguous. I mean, are they talking about the disposition of the immigration future for the for for for the petitioner? Are they talking about the disposition of a particular case? And these are these are such cases. And at least it seems to me it's at least it's ambiguous on that score. Well, I think I agree with you, your honor, that they're talking about the removal case itself. But there's many examples of administrative closure facilitating both the fair and efficient resolution of cases. Right. The fact pattern in matter of. But why is it why isn't it within the purview of the attorney general to say that the disposition of such cases and the use of this procedure is is is problematic? Because, in fact, it doesn't dispose of the cases. It assigns them to limbo as a practical matter. And and they're not heard from again. There's no record kept. There's no they're not monitored or tracked. They can be restored only if as a practical matter. DHS demonstrates, quote, good reason for to resume proceedings. I mean, not even not even the federal courts have that. We rarely use administrative closures, but any party can restore restore it to the docket just by asking. And it comes back on the docket. And that's all, by the way, that the attorney general spelled out. That's what the attorney general spelled out in his in his in his opinion. Anybody who he didn't insist that they all be returned to the docket immediately. It would be on the basis of the of individual part of a party or party request. So, you know, and that's at least at least that that much is is is is is pretty clear. But but if these are these if these cases are just consigned to limbo and by the hundreds of thousands, then how does that at all comport with the disposition of such cases appropriate and necessary for the disposition of such cases? And later in the reg that that the that the IJs are supposed to resolve the questions before them in a timely and impartial manner. Consistent with the regulations, the regulations are not you agree. Relations do not expressly authorize these closures. Right. That's pretty clear. That's common ground. Correct. But there's still an ambiguous we believe in authorizing this mechanism because of the expense of language. And I have a few responses to the points that you just made. So I want to start with the notion that administrative closure often results in the permanent suspension of a case. Even by the attorney general's own statistics, there's some one hundred and fifty thousand cases in which administrative closure did not result in a permanent suspension, but instead resulted in the calendaring and presumably resolution. And so I think the administrative closure has always been defined as a temporary suspension of the case. And, you know, it's a little late in the game for the attorney general to be redefining administrative closure, particularly when there's one hundred and fifty thousand examples to the contrary. Isn't that his job to call the shots when it comes to the procedures that are used by the agency over which he supervises supervision? I mean, he's delegated his authority by Congress. And then then he then issues the regs that are that are followed by presumably followed by the agency, you know, by the by the IJ, the BIA. And then and he has, I would think, the authority to interpret those regs. And if he does and his interpretations are not arbitrary and capricious, if they're reasonable, then why? What? Why can't you do that? Well, there's two responses to that, Your Honor. First, he he can't advance an interpretation of the regulations that he's duly promulgated that conflict with the plain text. Right. And if you believe that there is even a single case in which administrative closure is appropriate and necessary for the disposition of the removal case, then you have to conclude that his decision to say administrative closure is not authorized by the regulations is contrary to the regulations. That's that's not the case. The attorney general couldn't have said that he believes that too many cases have been closed for too long and provided instructions on how administrative closure should be modified or even perhaps used more sparingly. That's not what Castro did. And what he wanted to do was get rid of administrative closure. Then he had to amend the regulation, which, of course, the agency has eventually done in this new rule that Judge Sack was talking about. But that new rule does not apply retroactively to Mr. Benitez's case. And one more point. We passed the new rule trying to focus language in question. And it seems to me that there you know that you've got you've got two court of appeals going one way. You've got one court of appeals going the other way. They both say that the language is is unambiguous. That's always a problem. It's for the both. We face this all the time where lawyers come before us and each one reads the same position and says it's unambiguous. But but but they read them totally differently, which which to me indicates ambiguity. And here disposition of such cases seems to me at least ambiguous because what is the case? The case is the disposition of the case that's before the judge that the DHS instigated, prosecuted. It's it's it's that judge is responsible for whether or not the person is deported or not. And it's it's it's the disposition of that case. And that's the one that you just a minute ago conceded was the case in question. So if that's the case, then I don't see your your argument where that we can read the language any other way than appropriate and necessary for the disposition of such case. I mean, why don't you get a quick response to Judge Walker and then we're going to hear back from you on rebuttal and we'll hear from the other petitioner. So why don't you give an answer to that question and then. Thank you. Yes, your honor. So administrative closure can facilitate the disposition of a case. I want to be very clear about that. Take the fact that matter about this, which was the presidential decision of the agency that Castro to reverse. You know, there was a parallel removal proceeding before the immigration court and then a visa petition pending before USCIS. The immigration judge originally kept continuing the removal hearing, waiting for USCIS, but then realized that a single case file had to keep getting passed back and forth for every continued hearing. So the immigration judge determined that by closing the case, he would actually facilitate faster resolution of both the USCIS proceeding as well as the removal matter. That's one concrete example of ways in which administrative closure facilitates the disposition of the case. And that fact pattern is extremely common in the immigration system where pay profiles are still very much in use. And there's many other examples. And you're about to hear another one from Ms. Dobler. OK, thank you very much. We're going to hear back from you on rebuttal. Let's hear from the other petitioner, Ms. Dobler. Ann Dobler for Mr. Polino. May it please the court. I'd like to speak to the concern that there is some burden on the government in terms of recalendering a matter. I would note that in the majority of motions to recalendar, the action is taken by the clerk and just like a federal court. It's just by asking. The case is automatically recalendered. The only time that you would ever have a judge actually issue an order on a recalendering matter is if the motion is combined with something else, like a change of venue request that requires the judge to take action. So there's there's no burden on the government. And the the the continuing raising that these cases remain unresolved or that no one is paying attention to them. The prosecutor or the court either or the respondent of the alien can simply ask that the case be recalendered and it automatically appears on the next available master calendar of the court. There's no barrier there. OK, but these are again. Oh, sorry. Go ahead. I was saying, why are you objecting to what the attorney general said then in in in the case in question where he said, I'm reading requiring recalendering of all these cases immediately because that's that's essentially what he wanted. However, would likely overwhelm the immigration course and undercut the inefficient administration of immigration law. Consequently, I now order that all cases that are currently administrative close may remain closed unless DHS or the respondent requests recalendering, which is exactly what you're saying happens anyway. So where's the problem with his order? If if if recalendering at the request of the parties is is is is commonplace and that's what you say you say can be done now. How how's how's how are things changed as a result of his order as a practical matter? As a practical matter, your honor, for my client, he did not have a full and fair opportunity to have the issue in his underlying appeal decided because the board dismissed his appeal based on Castro to finding that judges unambiguously have no authority under the regulation. And I would also like to go back to a question by one of the panel in regards to the decision decisions of the attorney general language, your honor, because what I think is important about Castro to him is he wasn't giving immigration judges advice about how to use administrative closure. He was saying there's no statute, no regulatory provision that that provides any authority. I've never delegated that authority as the attorney general to immigration judges. But does he not does he not say both things? Does he not say, I think that this is a bad idea and we shouldn't be doing administrative closure. And all the arguments that there is administrative closure in the regulations don't work because this is how I interpret the regulations. Does he not say both things in his decision? Your honor, I would say that he says unambiguously that it it is not part of the delegated authority. He may also talk about that. But I think the conclusion of his decision is that it's unambiguously not there. But in regards to that, then you agree with what I understood your colleague to be saying a moment ago, that if the attorney general had simply said, I, in my capacity as attorney general, I'm making a decision that administrative closure should not be available, you'd be allowed to do that. But the problem is that his decision purported to be an interpretation of regulations. And you think he got that analysis wrong. And that's why we would we should vacate that decision. Is that you agree with that? Not entirely, your honor, because I would argue that even if you believe Castro Toome wasn't solely about it being unambiguous and that it was about his ability to give judges direction about how to use the tool of administrative closure. Then that decision is also not founded on an accurate description of how administrative closure is used. And it's an unreasonable interpretation of the regulation because there is no barrier. So you're saying because so we should say that the attorney general didn't understand the way administrative closure works. And therefore, even though he otherwise has the authority to make rules and decisions governing the conduct of IJs and the BIA, we should invalidate his decision here. Because he misunderstood the nature of administrative closure. Based on the description in Castro Toome as to what administrative closure is and how it's used, it seems to be contrary to the way that the Department of Homeland Security has used it. They're the prosecutors under the Obama administration. They made a prosecutorial discretion. If you have U.S. citizen kids, you go to the end of the line. We want to hear and take to trial those cases where an individual presents a danger to the United States. Something of that nature. And it's a prosecutorial choice in terms of what order to pursue the prosecution of the cases. Because there are hundreds of thousands of cases and a relatively small number of prosecutors and judges. It's not possible to take all of those cases to trial. So the prosecutor has a right to pretty standard recognition that a prosecutor has a right to determine their order of preference in the prosecution of their cases. Particularly in a realm where there are no trial rules. OK, well, if any of my colleagues have questions, we will hear from you again. I'm sorry. Go ahead. I just have one. One question. Ask your the other lawyer, which was the question of whether or not how this this this regulation is unambiguously on your side. I it seems to me that there are ambiguities in it. And if there are ambiguities in it, at that point, don't we aren't we looking at our keys or a deference here? Yes, your honor. Your honor, I would argue that our deference is inappropriate because the court, the attorney general has applied an entirely new interpretation that's contrary to 40 years of Board of Immigration Appeals precedent. And this court has recognized the Board of Immigration Appeals has expertise in immigration. The Board of Immigration Appeals has directed the use of administrative clauses. It's not like the attorney general himself blessed administrative closures in prior administrations and issued a reg to that effect that he's in effect. This guy's interpreted in a different way. He's interpreting a reg that has been interpreted differently by subordinates to him within the agency hierarchy. Right. I mean, you know, the attorney general has the authority from. And the attorney general has the has the authority to issue regs and the authority to supervise the agency that's under him. And this is a procedural matter. It's a matter of how they're going to handle cases. It seems to me that there's no substantive rights affected here, except insofar as they may be affected by a mishandling of procedures. But why doesn't he have the authority to determine what the procedures are going to be of the of the immigration courts? Well, I would argue that in in regards to our deference, that for my client in particular and for a number of other individuals in this circumstance, it presents an unfair surprise. There's 40 years of use of administrative closure where the Board of Immigration Appeals has directed it be used for individuals who are applying or who are. When would it not? When would it not be an unfair surprise? So because they've been doing it for 40 years, then the agency is powerless to change it. Anytime they decide to change it would be an unfair surprise. Usually when an agency changes its position, we say as long as the agency recognizes that it's changing its position and provides a reason justification for doing it. I understand you disagree with his analysis, but you don't disagree that he acknowledged that it had been the prior practice and he provided his reasons for changing the practice. I believe that the appropriate way to change this, and certainly he can change it, but he needs to change it by notice and comment rulemaking. Because of the nature of the change and because I believe the authority is provided to judges to administratively close matters by virtue of the regulations. And in regards to the issue of unfair surprise, it requires that the changed interpretation be reasonable and the changed interpretation we would argue is not reasonable. In Mr. Paulino's case, it actually prevents him from applying for a waiver that would change the difference between separation. Doesn't it have to be plainly inconsistent with the regulations? Isn't that our standard? My understanding is that unfair surprise, that then there's – I guess I have one other question about unfair surprise, and then I guess we'll hear from the other side. So, you know, you don't disagree that administrative closure was always discretionary on the part of IJs and the BIA. It was never that anyone was entitled to administrative closure. So how could it be an unfair surprise that some procedural mechanism that you were never entitled to and that an IJ could permissibly deny is now not available? Because the opportunity to apply for an I-601A waiver, which by regulation, the Department of Homeland Security required the individual to have an administrative closure order in order to file the application. And that was based on the fact that everyone believes there's unambiguous authority for immigration judges to grant administrative closure because it's been used and because the Board of Immigration Appeals has directed its use. Yeah, that's the way that the DHS regulations interact with this decision. But of course, your client can still apply after being ordered, removed, or when he appears for his visa interview, right? The difference for my client is a two-week trip outside of the United States versus potentially two years or longer. So it's a rather substantial interest for my client and his family, his U.S. citizen spouse, her disabled mother. The period of time to consular process- But in this very case, the IJ denied the administrative closure to your client even apart from Castro-Tum, right? So it's not as if he was entitled to it or necessarily would have gotten it in the absence of Castro-Tum, right? Well, we don't know because the appeal was never decided on the merits by the Board of Immigration Appeals. It was simply dismissed based on Castro-Tum. Other cases where there's been a dispute about administrative closure have been successful on appeals. But in any event, if the case is restored to the calendar, nothing prevents him from asking for continuances and adjournments, which has the benefit, at least, of providing some transparency and administrative regularity as opposed to the case disappearing down a black hole. Until a party can come in and show good cause for restoration. Continuances don't help an individual who needs an I-601A waiver. They literally need an order from the immigration judge saying the case was administratively closed. And there's no barrier to the court, sua sponte, reactivating a case. Cases don't get lost. If a case is not being reactivated, it's because the prosecutor, because the Department of Homeland Security isn't seeking to recalendar it. And there is no good cause requirement on recalendar. Okay, I think we have that argument. Thank you, Ms. Dobler. We'll get back from you on rebuttal. Let's hear from the government, Mr. Stalzer. Good morning, Your Honors and Counsel. My name is Rob Stalzer. I am here to represent the respondent in the Benitez-Marquez manner. Your Honors, before I start, I want to address Judge Stack's question about the new regulation. I do agree with Petitioner's Counsel. It wouldn't apply to this case. It is prospective applying to cases where new notices to appear have been filed or they've been recalendared. So that new regulation isn't going to change anything for Mr. Benitez-Marquez, Judge Stack. Turning to the question in this case, the question is whether there's a genuinely ambiguous regulation and that a reasonable interpretation of that regulation is that it grants the immigration judge, judges, and the board a general power of administrative closure. And there isn't such a regulation. Petitioner concedes it's not in the statute, so they don't get their authority that way. And if we actually look to the two regulations that they point to, those don't get you to administrative closure either. There's specifically limiting language in the regulation itself that makes it unambiguous that administrative closure is not an appropriate action to take by either the immigration judges or the board. And there's two reasons for that. The first is that it's not just any action. It's any action consistent with their authorities under the statute and regulation. And as we just said, the statute and the regulation do not contemplate administrative closure as a general power. There's some specific circumstances not related to our cases that the immigration judges have that power, but not here. And so that first language there, consistent with their authorities under the statute and regulations, that's one way that the term any action is cabined. And then, of course, the second way that that is limited is it's any action necessary for the disposition of the case. And disposition here doesn't just mean leaving a case hanging, which is what happens in these cases. Remember where these are in the pipeline. These are cases where the noncitizens have come before the immigration judge. They have been found either inadmissible or removable. And they're saying, look, Your Honor, we know you can't give us any form of relief right now. Please don't make an order today. Please don't dispose of our cases. Please give us time to figure out some outside of the court solution, something that you can't give us, but maybe somebody else can give us. And maybe one day we'll come back and resolve this question. But the regulations specifically provide that immigration judges shall seek to resolve the questions before them in a timely manner. Same thing with the board. It has to be a timely resolution. So when we say that, when we ask ourselves, what does disposition of such cases mean? I think the regulations are clear. It means a timely disposition, not one where things simply hang in limbo. And again, when we look to the regulations for continuing. What about the other point that I had that I had made where this whole thing, whatever authority it provides, is subject to the applicable governing standards. And subsection D makes clear that decisions of the attorney general are applicable governing standards. And so if the attorney general says no administrative closure, doesn't that qualify the whole branch of authority, whatever it is in this regulation? I agree that it does, your honor, because that's a statutory power of the attorney general, not just a regulatory power, but the statute provides that he supervises the immigration judges and that any powers that they have have to derive from him. So when the AG says I'm looking at these regulations and I think they mean X, Y and Z, well, then the immigration judges have no authority to go outside that. They simply mean what the immigration judge says, excuse me, what the attorney general says they mean. Well, do you see the attorney general's decision in Castro-Tum the way opposing counsel sees it as? Well, his decision was based entirely on an interpretation of the regulation. But the answer is no. Even if he had the authority, even if he had the authority to make a decision as a policy matter, he didn't do that. And so that would be a basis for invalidating it. Do you agree with that reading of Castro-Tum? No. No, I don't. But I see I see it both both ways. First, he does look at it as a policy matter. It's a good policy and seems to say no. But he then goes and looks and says, well, we have to look at this language. And the reason he does that is because he recognizes that the board has previously recognized this procedure. You know, for years, the board has done this. The attorney general goes back to those decisions and says, what basis did the board have to make this conclusion? And the answer, when you look at those old cases, is there really isn't one. They assumed that power and then it sort of got away from them over the years until we get to a matter of a petition where they're now talking about applying certain standards. In this case, this is how you use them. And the agency came back and said, wait a minute, wait a minute. We have to go back to first principles, go back to the text. What does the text say? The text here does not contemplate administrative closure as a general power that immigration judges have. So that's what he found in matter of Castro, too. Well, part of part of this. So if I'm not mistaken, is not only that, that this particular language is silent about administrative closures, but that there are. But but but the the regs are not silent when it comes to adjournments and continuances. That's that's that's. And that that it doesn't mean that it does mean that when they wanted to do something along these lines, they knew how to how to how to go go down that road. And they did it with with those two steps to other procedures. Right. Correct. Your Honor. Yeah, there is a mechanism for the immigration judges to extend their cases in the appropriate circumstance. And the appropriate circumstance isn't, however, when we're in limbo, when a case is simply going to go away and maybe never come back. And we're waiting on some outside of court activity that may or may not occur over the course of years. And that's why the. The argument that I heard from the other side here had to do with the situation in which there are two outside agencies, both of which need the papers that have to be before the IJ and therefore it can't be managed. The procedures can't go on elsewhere in the government to try and secure this person's status that would keep him in the country unless there's a continuance, because you can't unless there's a administrative closure because the papers have to have to be used over there. And I'm wondering now, I mean, everything's done electronically. Is the agencies of DHS such that it's still everything's still on paper over there? Or if it's this argument goes away, it seems to me. Right. I can tell you I don't work for DHS, so I don't know 100 percent exactly what they're doing. But in all of my cases, it's not in paper. We operate in PDFs. Often things are filed. They have to get scanned in. So then you can see it, which might be an administrative step in the middle. But the situation where apparently the papers were getting shuffled back and forth and back and forth, they don't know is the problem, particularly because, you know, we have photocopiers. We can just make a copy of the record and send it. If it were necessary in cases which I might add, I want to say to specifically in regards to my case, Benitez Marquez, when we're talking about a U visa. That's not that's not an issue. That's not a question for us. Not only can U.S.C.A.S. adjudicate these regardless of what the immigration court is doing, but in fact, U.S.C.A.S. can grant petitioner Benitez Marquez a U visa even if he's subject to a final order of removal. So it's not even like that delay was necessary to get him the actual outside relief he was seeking. So can I ask a question about this unfair surprise question? So you say that it's not an unfair surprise because the attorney general interpreted the regulations as a matter of first impression. But that can't be right. I mean, this has been the practice of the agency for 40 years, right? Correct, Your Honor, but two things about that. First, in our case, a matter of past return came out when this was still before the immigration judge. So it's not like there was a surprise in terms of this particular petitioner. The proceedings were still open when that decision was issued before the immigration judge. But even more than that, just as a broader general term, we're not talking about unfair surprise because there's no right to administrate closure. It's never something that shall be granted, except in some specific cases related to, I think, Haitian petitioners and things like that, which are specific cases that don't really apply to Kestrel Toome. We're talking about a 100 percent discretionary grant, which I don't think you could ever say you're entitled to. You know, the removal, you know, when you have something that you're not entitled to, that's taken away from you. I don't know if that's an unfair surprise. I don't even know if that's a surprise at all. So do you think the principle about unfair surprise would be if you're losing an entitlement, that that's what you think we should understand the unfair surprise standard? Right, because there's no entitlement. Yes, and also I will add to that in the particular context of my case, what we're talking about at Uvisa, where the petitioner continues to be eligible for it, even if he has a final order of removal. What's the surprise? He's going to he's eligible for it either way we go. So how can you say, you know, it's created some unfair burden for him. He's still eligible to apply for that. And USCIS is still eligible to grant it, even if the immigration judges decides that he's not going to administratively close the case. OK. All right. Unless my colleagues have further questions, we'll hear from the other government attorney. Another case, Mr. Stanton. May it please the court. I know that the court scheduled case number 19, 19, 2, 4, 9, 1, to discuss the property of Castro, too, and I'll answer any questions the court may have to the best of my ability. Hopefully not duplicating what Mr. Saltzrode said, but I would like to highlight that this particular case, this is a particularly poor vehicle for the property of Castro, too, because the whole point of why the petitioner in this case wanted to seek an administrative closure was to pursue an unlawful presence waiver with another agency. But it does not look like he would have gotten that, as the immigration judge found in this case, because he committed fraud. He lied about his identity to immigration officials in order to get into the country. And that is ground for denying an unlawful presence waiver. But that's not the ground on which the BIA relied in denying his appeal, is this? That's not the ground, but to the extent that he's making a due process argument, he's got to show a likelihood that the result will be different if the case is remanded. So I understand, Your Honor, may I concern you about the Teneri doctrine, but the Teneri doctrine is not set in stone, that there are nuances, there's futility, there's harmlessness, there's the common sense principle. I mean, the record makes clear that he told immigration officials that he was afraid if he gave his correct name, he would be reprocessed earlier and sent back to the Dominican Republic. That's classic fraud. It doesn't get any more basic than that. So it's based on this record. I mean, even if you were to remand, I mean, the board would almost certainly determine that he was unlikely to get the conditional waiver anyway. So therefore, no prejudice. Now, Fisher argues in his reply, breaching that opportunity to appeal that to the board. But again, same difference. I mean, without showing them a likelihood that the result would have been different. You cannot show a due process violation. So with respect to some of the other issues that were talked about, I believe it was Judge Walker said that there is no substantive right to administrative closure. And that is absolutely correct. If my colleague explain a little further, the attorney general and Castro to discuss the history of administrative closure and noted that the practice apparently began in. And. And in 1984, but even prior to that time, there were aliens about nonsense and very similar situated to the petitioner here where they enter the country illegally. They put in removal proceedings. They found a spouse, got married, began to apply for family, for family visas. They asked to remain in the country while that visa application was processed so they could apply for just the status. And the answer was no. And court upheld those decisions, including this court. This is not cited in our brief, but I can refer the court to a case called Gerrong Shower, D.R. dash R.O.N.G. C.H.O.U.R. versus I.N.S. 578 S. 2nd 464 468 2nd Circuit 1978 of all the very similar circumstances in here. And the court found no substantive right to remain in the United States while the family visa was being been approved, even to what to apply for. I'm adjusting the status. So the attorney general in this case, I mean, like I noted that the policy of policy of administrative closure began 1984. But so just important for the court to understand what happened even before that. So and so there's just no substantive right to this being violated here for substitute process or unfair surprise purposes. Going back to ambiguity. Well, you don't you don't deny you don't deny that because the DHS regulation relies on administrative closure, this is going to make a big difference for him. Assuming I understand you're saying that he can't obtain it anyway. But but you have to leave the country for two years as opposed to a brief period of time. Well, the DHS regulation does refer to administrative closure. But as the attorney general said in footnote three in Castro three, the DHS regulations cannot create a substantive right to administrative closure. And the immigration courts with which is a separate entity of DHS. Right. So, you know, you don't you don't deny that it has that consequence for him. You just you just deny that it's a substantive right. Well, to the consequence, yes, I would agree with that. So, yes, that also said, like as we said in our appellate brief, he does have other remedies other than the administrative closure thing. The administrative closure remedy is the regulation right below the DHS regulations. The DHS remedy is H.C.R. 212.7E44 allows him to apply for a to reapply for admission under with USCIS without without needing administrative closure. Mr. Dobler said that that takes too long, but it's certainly no worse off than he would have been if he had applied for admission to the United States legally in the first place, rather than try to get here through a legal means and officially claim asylum, which apparently got dropped for reasons I'm not sure. But he's no worse off than the people who are waiting in line to do it the right way, the right way. That's your question. Yes. OK. Thank you very much. So unless my colleagues have further questions, we'll say no. Yeah, go ahead. I have no further. No. OK. That was a negative. OK. So thank you, Mr. Stanton. We'll hear back from the petitioners on rebuttal. Mr. I apologize. Thank you, Your Honor. I'd like to make two points, one about regulatory interpretation and the other about Mr. Benitez himself and how Castro Tomb affected him. So the first point that I want to make is Judge Walker, as well as your judgment, as she said, which is that this court believes that the regulations are ambiguous. But I think you have to conclude that the AG interpreting the regulations to be unambiguous is wrong. And then I think you at this court wouldn't have to violate settled principles of administrative law if you affirm what the AG would have done had he found the regulations ambiguous. And I'll just point you to what the Seventh Circuit did, what now Justice Barrett did in the Seventh Circuit opinion where the court struck down Castro Tomb. She said when an agency doesn't even ask for deference because it doesn't believe that a regulation is ambiguous, then courts shouldn't give it. And I think that's the case here. And then my second point is about Mr. Benitez. I want to talk about what happened to him. So he was cooperating with prosecutors when he was placed in removal proceedings, and he continued to cooperate with prosecutors after that point. The entire time he was cooperating, administrative closure was available to him. And so he reasonably thought that he could seek both a U visa before USCIS as well as administrative closure before the immigration court. Now, he wasn't guaranteed administrative closure, but he had a fair shot at asking for it. Then midway through his agency proceedings, Castro Tomb came down and pulled the rug out from under him. That was how he was unfairly surprised. And that's how his reliance interests were scuttled. And the Supreme Court just last term in the DACA case said that even though a benefit is discretionary, does it mean that people can't reasonably rely on it? And an agency asks arbitrarily when it doesn't even consider reliance interests. That's exactly what Castro Tomb did. And Castro Tomb, you know, got rid of an abeyance mechanism. I mean, administrative closure is just an abeyance, like this court might enter an abeyance when you're waiting for a collateral matter, like say a Supreme Court decision or a parallel state court proceeding. It's just a way to say a case to allow for a collateral matter that could affect the removal proceedings to play out so that when you get to a decision, you can get to it just one time and you get to the right decision. That's what Castro Tomb took away. And it interpreted the regulations as unambiguously not authorizing this mechanism, and that's incorrect. And that's why we'd ask you to reverse the order and remand the case. Thank you very much. Ms. Dobler. Yes, a couple points. First, it's not always true that the individual has been found inadmissible or removable at the time administrative closure is granted. It can be granted at the very beginning. A person has temporary protected status. There may be no determination about removability prior to the grant of administrative closure. Also, in regards to the examination of regulatory language and the fact that there are particular parts of the regulation that address adjournments or continuances, I would note that the difference is those particular parts need to have more description because the Attorney General in the regulation specifically limits and requires a showing of good cause. For administrative closure, until a matter of Avietsin in 2012, administrative closure was always a joint request for the parties. So it couldn't occur unless both parties agreed. So I think that there's some things to examine there in regards to those particular issues. In regards to the applicable governing standards, the decision of the Attorney General. Sure. Sorry. Yeah, just one little question, and I just want to be very clear on this. I take it that now the situation is that neither party needs to request it to get an administrative closure. The IJ just could do it on his or her own volition, at least until prior to Casper 2. Is that right? No, we still have to make an appropriate motion that still applies a matter of Avietsin standard in the cases where administrative closure is still possible. One side applies, and if the other side objects, that's not a problem. You could still get the closure, right? For the limited amount of things where administrative closure is possible under Castro 2, yes. And the judge could certainly, on his own, sui sponte administratively close a case. That's always been true. Talking about prior to Casper 2, the practice then, in terms of one person initiating administrative closure, or whether it was sui sponte. All of those things. For example, in a case where the alien in the removal proceedings has things that indicate he might not be competent to proceed, judges sometimes have administratively closed on their own motion. I think that's the one that sticks out in my mind, or if there's a competency issue because it's a very young child, those kinds of issues. I did want to speak to one other point. The decisions of the Attorney General in the applicable governing standards issue, I would argue that there are times when the Attorney General has to issue a new regulation. You need notice and comment rulemaking. He can't just change it on his own, and that's what we have in this case. He needed to do notice and comment rulemaking and issue a new rule because I believe that— Well, the Attorney General is authorized to make these kinds of decisions by decision. That happens. So your argument that he needs to do a new regulation is just based on your other argument that his decision here conflicts with the unambiguous language of the regulation, and so therefore you need to change the regulation. But there's nothing inherently inappropriate about the Attorney General setting standards by decision. He's authorized to do that, and that's how the Attorney General has proceeded in this area before. Yes, except I would argue that this isn't about setting standards. Castro-Toome is about saying it doesn't exist. Right, okay. I haven't delegated— Sorry, you can wrap up and then we'll conclude. Thank you. I would just like to wrap up on the critical impact of the lack of administrative closure for individuals such as my client and individuals who are crime victims. How are prosecutors going to get crime victims to cooperate if they're constantly worried about being removed? That's the whole purpose of the U visa. So if there's no way for the court to put that case on hold, why is a victim witness going to come forward? They can have what happened to the El Paso victim witness who just got deported this week happen to them. No, but that happens all the time in regular litigation in the Article III courts. You have a civil action, you have a criminal—a civil action is stayed until the completion of the criminal case. People who are going to cooperate with the government are not sentenced. That sentence is adjourned or continued. Those matters are all taken care of by continuances and adjournments. And why would that not be true here? Because in this particular case, the U visa process can take a while. And Congress wants to ensure that people are available and that they get the benefit of the U visa. It was to protect crime victims, to encourage them to work with prosecutors. On the criminal side, prosecutors often move to have sentences continued because of a cooperating witness. And that sentence can be continued for years, five years, four or five years. The person may be cooperating in a huge number of cases and testifying and all those things which matter. And, of course, that person is interested in having a deferral because obviously is hoping for a reduced treatment later on. But you have these continuances. And I've never heard of a case being administratively closed for that purpose in the federal courts. But in this particular case, the government, in regards to Mr. Benitez, who had a pending viable U visa, that everyone agreed was viable based on his cooperation, was placed in the position of facing removal despite his cooperation. And for some individuals, and I would argue for Mr. Benitez, that relief that DHS has control over, that U visa, he's granted that U visa, his immigration court proceedings are terminated.  And the difference for— But he doesn't have an automatic entitlement for that, right? I mean, the reason that he was in removal proceedings is because he had committed other crimes. And so there was a removal proceeding. And it's possible if he had gotten the U visa, that would have been terminated. But it wasn't. I mean, Congress did not say that if you're eligible to apply for a U visa, all removal proceedings have to be terminated. Did it? I mean, we're not—he's not losing out on something that Congress said he should get. It's only if he actually obtains the U visa that the proceedings would be terminated. That's except the Department of Homeland Security has control over how quickly that U visa adjudication is completed. The prosecutor is controlling the speed of the U visa adjudication. Okay. Okay. Thank you, Ms. Dobler. The piece is—